490 F.3d 143
 Javaid IQBAL, Plaintiff-Appellee,
v.
Dennis HASTY, former Warden of the Metropolitan Detention Center, Michael Cooksey, former Assistant Director for Correctional Programs of the Bureau of Prisons, John Ashcroft, former Attorney General of the United States, Robert Mueller, Director of the Federal Bureau of Investigation, David Rardin, former Director of the Northeast Region of the Bureau of Prisons, Michael Rolince, former Chief of the Federal Bureau of Investigation's International Terrorism Operations Section, Counterterrorism Division, Kathleen Hawk Sawyer, former Director of the Federal Bureau of Prisons, Kenneth Maxwell, former Assistant Special Agent in Charge, New York Field Office, Federal Bureau of Investigation, Defendants-Appellants.
 Docket No. 05-5768-CV (L).
 Docket No. 05-5844-CV (con).
 Docket No. 05-6379-CV (con).
 Docket No. 05-6352-CV (con).
 Docket No. 05-6386-CV (con).
 Docket No. 05-6358-CV (con).
 Docket No. 05-6388-CV (con).
 United States Court of Appeals, Second Circuit.
 Heard: October 4, 2006.
 Decided: June 14, 2007.
 
 Michael L. Martinez, Wash., D.C. (Shari Ross Lahlou, David E. Bell, Justin P. Murphy, Matthew F. Scarlato, Crowell & Moring LLP, Washington, DC, on the brief), for Defendant-Appellant Hasty.
 Gregory G. Garre, Deputy Solicitor Gen., Dept. of Justice, Washington, DC (Peter D. Keisler, Asst. Atty. Gen., Gregory G. Katsas, Deputy Asst. Atty. Gen., Kannon K. Shanmugam, Asst. to the Solicitor Gen., Barbara L. Herwig, Robert M. Loeb, Dept. of Justice, Washington, DC; Dennis C. Barghaan, Richard W. Sponseller, Larry Lee Gregg, Asst. U.S. Attys., Alexandria, VA.; R. Craig Lawrence, Asst. U.S. Atty., Washington, DC, on the brief), for Defendants-Appellants Ashcroft and Mueller.
 Mark E. Nagle, Troutman Sanders LLP, Wash., D.C. (William E. Lawler, III, Cheryl A. Curtis, Nashiba D. Boyd, Vinson & Elkins, L.L.P., Washington, DC; Raymond R. Granger, New York, N.Y., on the brief), for Defendants-Appellants Sawyer, Cooksey, and Rardin.
 Lauren J. Resnick, New York, N.Y. (Fernando A. Bohorquez, Jr., Baker & Hostetler, LLP, New York, N.Y.; Leslie R. Caldwell, Morgan, Lewis & Bockius LLP, New York, N.Y., on the brief), for Defendants-Appellants Rolince and Maxwell.
 Alexander A. Reinert, New York, N.Y. (Keith M. Donoghue, Elizabeth L. Koob, Joan Magoolaghan, Koob & Magoolaghan, New York, N.Y.; Haeyoung Yoon, Urban Justice Center, New York, N.Y.; Mamoni Bhattacharyya, David Ball, Weil, Gotshal & Manges LLP, New York, N.Y., on the brief), for Plaintiff-Appellee Iqbal.
 (Anil Kalhan, New York, N.Y., for amici curiae Civil Rights Organizations in support of Plaintiff-Appellee.).
 (Michael J. Wishnie, New York, N.Y., for amici curiae Individuals and Religious Organizations in support of Plaintiff-Appellee.).
 Before: NEWMAN, CABRANES, and SACK, Circuit Judges.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 These interlocutory appeals present several issues concerning the defense of qualified immunity in the aftermath of the events of 9/11. Several current and former government officials from the Department of Justice, the Federal Bureau of Investigation ("FBI"), and the Bureau of Prisons ("BOP") appeal from the September 27, 2005, Order of the District Court for the Eastern District of New York (John Gleeson, District Judge) denying in part their motions to dismiss on the ground of qualified immunity. See Elmaghraby v. Ashcroft, No. 04 CV 1409, 2005 WL 2375202 (E.D.N.Y. Sept. 27, 2005) ("Dist.Ct.op."). Plaintiff-Appellee Javaid Iqbal alleges that the Defendants-Appellants took a series of unconstitutional actions against him in connection with his confinement under harsh conditions at the Metropolitan Detention Center ("MDC") in Brooklyn, after separation from the general prison population. We conclude that the defense of qualified immunity, to the extent rejected by the District Court, cannot be sustained as to any Defendants at this preliminary stage of the litigation except as to the claim of violation of procedural due process rights, and we therefore affirm in part, reverse in part, and remand.
 
 Background
 
 2
 Parties. Iqbal is a Muslim Pakistani currently residing in Pakistan. Iqbal's co-plaintiff was Ehad Elmaghraby, a Muslim Egyptian. After Judge Gleeson's ruling on the motions to dismiss, the United States settled Elmaghraby's claims by payment of $300,000.
 
 
 3
 Four groups of Defendants have filed appeals from Judge Gleeson's order. The first group consists of former Attorney General John Ashcroft and current FBI Director Robert Mueller. The second group consists of Michael Rolince, former Chief of the FBI's International Terrorism Operations Section, Counterterrorism Division, and Kenneth Maxwell, former Assistant Special Agent in Charge of the FBI's New York Field Office (the "FBI Defendants"). The third group consists of former BOP officials: Kathleen Hawk Sawyer, former BOP Director; David Rardin, former Director of the Northeast Region of the Bureau of Prisons; and Michael Cooksey, former Assistant Director for Correctional Programs of the Bureau of Prisons (the "BOP Defendants"). The fourth appeal was filed by Dennis Hasty, former MDC Warden. Other Defendants include Michael Zenk, MDC Warden at the time the lawsuit was filed, other MDC staff, and the United States.
 
 
 4
 Factual allegations. The complaint alleges the following facts, which are assumed to be true for purposes of the pending appeals, as we are required to do in reviewing a ruling on a motion to dismiss. See Hill v. City of New York, 45 F.3d 653, 657 (2d Cir.1995). The Plaintiff was arrested by agents of the FBI and the Immigration and Naturalization Service on November 2, 2001.[1] Following his arrest, he was detained in the MDC's general prison population until January 8, 2002, when he was removed from the general prison population and assigned to a special section of the MDC known as the Administrative Maximum Special Housing Unit ("ADMAX SHU"), where he remained until he was reassigned to the general prison population at the end of July 2002. On this appeal, we consider only claims concerning the Plaintiff's separation from the general prison population and confinement thereafter in the ADMAX SHU. We do not consider the legality of his arrest or his initial detention in the MDC.
 
 
 5
 The complaint further alleges that in the months after 9/11, the FBI arrested and detained thousands of Arab Muslim men as part of its investigation into the events of 9/11. The fact of their detention, its duration, and the conditions of confinement depended on whether those arrested were classified as "of high interest." Many of these men, including the Plaintiff, were classified as "of high interest" solely because of their race,[2] religion, and national origin and not because of any involvement in terrorism. In the New York City area, all Arab Muslim men arrested on criminal or immigration charges while the FBI was investigating a 9/11 lead were classified as "of high interest." The FBI Defendants were responsible for making these classifications for detainees arrested in the New York City area, including the Plaintiff.
 
 
 6
 The complaint further alleges that Ashcroft and Mueller approved a policy of holding detainees "of high interest" in highly restrictive conditions until they were "cleared" by the FBI. In early October, BOP Defendant Cooksey, with the knowledge of BOP Defendant Sawyer, directed that all detainees "of high interest" be held in the most restrictive conditions possible. FBI officials were aware that the BOP was relying on this classification to hold detainees in restrictive conditions.
 
 
 7
 The complaint further alleges that soon after 9/11, the MDC created within the MDC an ADMAX SHU, the BOP's most restrictive type of confinement, to house the detainees "of high interest." The procedures for handling ADMAX SHU detainees were developed by MDC staff, at the request of Defendant Hasty. ADMAX SHU detainees were permitted to leave their cells only one hour each day, and all legal and social interactions were non-contact. Movement outside their cells required handcuffs and leg irons and four-officer escorts. Movement inside their cells was monitored by video cameras. For many weeks, the detainees were subject to a communications blackout.
 
 
 8
 The complaint further alleges that the MDC did not conduct any review of the detainees' segregation in the ADMAX SHU. Instead, the detainees remained in the ADMAX SHU until the FBI approved their release to the general population. As a result, numerous detainees were held in the ADMAX SHU for extended periods of time even though there was no evidence linking them to terrorism.
 
 
 9
 The complaint further alleges that the Plaintiff was transferred to the ADMAX SHU on January 8, 2002. He was kept in solitary confinement. Until March, the lights in his cell were left on almost 24 hours a day, and MDC staff deliberately turned on air conditioning during the winter and heating during the summer. MDC staff left the Plaintiff in the open-air recreation area for hours when it was raining and then turned on the air conditioner when he returned to his cell. Whenever the Plaintiff was removed from his cell, he was handcuffed and shackled. The Plaintiff was not provided with adequate food and lost 40 pounds while in custody. MDC staff called him, among other things, a "terrorist" and a "Muslim killer."
 
 
 10
 The complaint further alleges that the Plaintiff was brutally beaten by MDC guards on two occasions: upon his transfer to the ADMAX SHU in January 2002 and again in March. Following the March beating, the Plaintiff was denied medical care for two weeks even though he was in excruciating pain. He was also subjected to daily strip and body-cavity searches. The March beating was prompted by the Plaintiff's protestations to a fourth consecutive strip and body-cavity search in the same room. MDC staff interfered with the Plaintiff's prayers, routinely confiscated his Koran, and refused to permit him to participate in Friday prayer services. They also interfered with the Plaintiff's communications with his defense attorney, for example, by disconnecting the phone if the Plaintiff complained about his conditions of confinement and delaying his receipt of legal mail for up to two months.
 
 
 11
 The Plaintiff pled guilty on April 22, 2002, and was sentenced on September 17, 2002. He was released from the ADMAX SHU at the end of July 2002, after pleading guilty but before sentencing. Judge Gleeson considered the Plaintiff to be a pretrial detainee throughout his entire time in the ADMAX SHU. Dist. Ct. op. at *15 n. 14. The Plaintiff was released from the MDC on January 15, 2003, and thereafter was removed to Pakistan (a fact not in the complaint but undisputed).
 
 
 12
 Litigation in the District Court. The Plaintiff (and his co-plaintiff) commenced this action in May 2004. Their complaint asserted twenty-one causes of action, including both statutory claims and constitutional tort claims pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The causes of action, and the Defendants against whom they were asserted, are set forth in the margin.[3]
 
 
 13
 Ashcroft and Mueller, the FBI Defendants, the BOP Defendants, Hasty, the MDC Warden, and an MDC medical assistant[4] filed motions to dismiss on the grounds that (1) a Bivens action was precluded by "special factors," (2) they were protected by qualified immunity, (3) the supervisory defendants were not alleged to have sufficient personal involvement, and (4) Ashcroft, Mueller, the FBI Defendants, and the BOP Defendants were not subject to personal jurisdiction in New York. In addition, the United States moved to be substituted as the defendant on the ATCA claim (Count 21) and for dismissal of that claim.
 
 
 14
 With a few exceptions, Judge Gleeson denied the motions to dismiss. He first rejected Ashcroft's argument that "special factors," namely the post-9/11 context, precluded a Bivens action in this case. See Dist. Ct. op. at *14. Judge Gleeson then turned to the substance of the Plaintiff's Bivens claims. He denied Hasty's motion to dismiss the conditions of confinement claims (Counts One and Eight), concluding that the Plaintiff had adequately alleged (1) illegitimate reasons for the conditions of his confinement and (2) Hasty's personal involvement. See id. at *15-*17. He also found adequate allegations of Hasty's personal involvement in the claims of excessive force (Counts Three and Four), interference with the Plaintiff's right to counsel (Count Five), unreasonable strip searches (Count Nine), and interference with the Plaintiff's exercise of religion (Count Ten). See id. at *22, *27, *28. However, he found the allegations insufficient to support the personal involvement of BOP Defendant Sawyer in the unreasonable strip searches and dismissed this claim against her. See id. at *27.
 
 
 15
 With respect to the procedural due process claim (Count Two), Judge Gleeson found that the Plaintiff had alleged both a deprivation of a liberty interest that involved "atypical and significant" hardships compared to the conditions in the general prison population and the absence of any due process protections, that the Plaintiff's right was clearly established, and that he could not assess the objective reasonableness of the Defendants' actions as a matter of law at this stage of the litigation. See id. at *18-*20. He also found that the Plaintiff had adequately alleged the personal involvement of all the Defendants, observing that "the post-September 11 context provide[d] support for [the P]laintiffs' assertions that [the D]efendants were involved in creating and/or implementing the detention policy under which [the P]laintiffs were confined without due process." See id. at *20-*21. Finally, with respect to the procedural due process claim, he limited the first stage of discovery to the issue of the Defendants' personal involvement in the alleged denial of due process. See id. at *21.
 
 
 16
 With respect to the Plaintiff's Bivens claims of race and religious discrimination (Counts 11 and 12), Judge Gleeson ruled that the Plaintiff's allegations that he was confined in significantly harsher conditions solely because of his race and religion were sufficient to state a cause of action. See id. at *29. He also concluded that the Plaintiff had adequately alleged the personal involvement of Ashcroft and Mueller, the FBI Defendants, and Hasty. See id. However, because the Plaintiff had not alleged that the BOP Defendants were involved in the challenged classification in any way, Judge Gleeson concluded that the Plaintiff had not alleged the personal involvement of the BOP Defendants, and he dismissed these claims against them. See id.
 
 
 17
 Turning to the Plaintiff's statutory claims, Judge Gleeson dismissed the RFRA claims against all the Defendants, concluding that they were entitled to qualified immunity because it was not clearly established that RFRA applied to federal government officials. See id. at *30-*31. He also dismissed the ATCA claim after first having substituted the United States for the individual defendants. See id. at *34-*35. Finally, he denied the motions to dismiss the section 1985(3) conspiracy claims, rejecting the Defendants' arguments that it was not clearly established that section 1985 applied to federal officers and concluding that the Plaintiff had adequately alleged the Defendants' personal involvement, except with respect to the allegation that the BOP Defendants had conspired to subject the Plaintiff to unreasonable strip searches. See id. at *32-*33.
 
 Discussion
 
 18
 The Defendants appeal from the District Court's order denying their motions to dismiss on the ground of qualified immunity. Their arguments with respect to qualified immunity fall into several broad categories: (1) the Plaintiff's allegations do not allege the violation of a clearly established right, (2) do not allege sufficient personal involvement of the Defendants in the challenged actions, (3) are too conclusory to overcome a qualified immunity defense, and (4) the Defendants' actions were objectively reasonable. Permeating the Defendants' assertion of a qualified immunity defense is the contention that, however the defense might be adjudicated in normal circumstances, the immediate aftermath of the 9/11 attack created a context in which the defense must be assessed differently and, from their standpoint, favorably.
 
 
 19
 In addition, Ashcroft, Mueller, and FBI Defendant Rolince seek review of the denial of their motion to dismiss for lack of personal jurisdiction, arguing that the issue of personal jurisdiction is available for review on this interlocutory appeal because the issue is inextricably intertwined with that of qualified immunity.
 
 
 20
 Because many of the Defendants' grounds for asserting an immunity defense overlap with respect to several of the Plaintiff's allegations, it will be convenient to consider separately each of the Plaintiff's causes of action with respect to the one or more Defendants against whom it is asserted, rather than consider separately the claims asserted against each Defendant. Before turning to each of the Plaintiff's allegations, we first consider the legal standards that apply to nearly all of the Plaintiff's claims and to most of the grounds on which the Defendants assert their qualified immunity defense.
 
 I. General Principles of Qualified Immunity
 
 21
 (a) Standard of review. When a district court denies qualified immunity on a Rule 12(b)(6) motion to dismiss, "we review the district court's denial de novo, accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor." Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 250 (2d Cir.2001).
 
 
 22
 (b) Appealability. A district court's denial of qualified immunity is appealable as a collateral order if it turns on an issue of law. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, a defendant may appeal a district court's ruling denying qualified immunity when, if a plaintiff's allegations are assumed to be true, the only question is whether the alleged conduct violated a clearly established right. See Locurto v. Safir, 264 F.3d 154, 163 (2d Cir.2001).
 
 
 23
 (c) The qualified immunity defense. Qualified immunity is an immunity from suit and not just a defense to liability. See Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. See id. at 201, 121 S.Ct. 2151; see also Scott v. Harris, ___ U.S. ___, 127 S.Ct. 1769, 1774 & n. 4, 167 L.Ed.2d 686 (2007). If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action—that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." See Saucier, 533 U.S. at 202, 121 S.Ct. 2151. A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law. See Johnson, 239 F.3d at 250.
 
 
 24
 In determining whether a right was clearly established, the court must assess whether "the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was] doing violate[d] that right." Id. at 250-51 (internal quotation marks omitted). To that end, the court should consider what a reasonable officer in the defendant's position would have known about the lawfulness of his conduct, "not what a lawyer would learn or intuit from researching case law." Id. at 251 (internal quotation marks omitted). Furthermore, the court need not identify "legal precedent addressing an identical factual scenario" to conclude that the right is clearly established. Id.; see also Tellier v. Fields, 280 F.3d 69, 84 (2d Cir.2000) (noting that a law is "clearly established" so long as a ruling on the issue is "clearly foreshadow[ed]" by this Circuit's decisions).
 
 
 25
 (d) Personal involvement. Many of the Defendants claim qualified immunity on the ground that the Plaintiff has failed to allege their personal involvement in the challenged actions. All of the appealing Defendants are supervisory officials. The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (discussing section 1983 liability).
 
 
 26
 Although a lack of personal involvement may be grounds for dismissing a claim on the merits (a ruling that would not be subject to an interlocutory appeal), such a lack is also relevant to a defense of qualified immunity because it goes to the question of whether a defendant's actions violated a clearly established right. See McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999) ("Where there is a total absence of evidence of [a violation], there is no basis on which to conclude that the defendant seeking qualified immunity violated clearly established law." (internal quotation marks omitted)). "[O]ur task is to consider whether, as a matter of law, the factual allegations and all reasonable inferences therefrom are insufficient to establish the required showing of personal involvement." Johnson, 239 F.3d at 255.
 
 
 27
 (e) Pleading requirements. The parties dispute the extent to which a plaintiff must plead specific facts to overcome a defense of qualified immunity at the motion-to-dismiss stage. Although most of the Defendants disclaim requiring the Plaintiff to meet a heightened pleading standard, beyond the requirement of Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," see Fed.R.Civ.P. 8(a)(2), all the Defendants make the somewhat similar argument that "conclusory allegations" will not suffice to withstand a qualified immunity defense, especially with respect to allegations of supervisory involvement, racial and/or religious animus, or conspiracy. BOP Defendant Cooksey explicitly urges us to adopt a heightened pleading standard in Bivens actions.
 
 
 28
 The pleading standard to overcome a qualified immunity defense appears to be an unsettled question in this Circuit. Four Supreme Court opinions provide guidance, although the guidance they provide is not readily harmonized. In Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Court rejected a heightened pleading standard in a civil rights action alleging municipal liability, applying instead only the traditional requirement of "`a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 168, 113 S.Ct. 1160 (quoting Fed.R.Civ.P. 8(a)(2)). In reaching this conclusion, the Court distinguished between municipalities' immunity from respondeat superior liability and government officials' qualified immunity from suit. See id. at 166, 113 S.Ct. 1160. Arguably, this distinction could permit requiring a plaintiff to satisfy a heightened pleading standard of a cause of action in order to overcome a government official's defense of qualified immunity. However, the Court's opinion in Leatherman suggests that heightened pleading standards are never permissible except when authorized by Rule 9(b) of the Federal Rules of Civil Procedure. See id. at 168, 113 S.Ct. 1160 (noting that Rule 9(b) "do[es] not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983"). Indeed, the Court observed that, in the absence of amendment to Rules 8 or 9, the courts could rely only on control of discovery and summary judgment to "weed out unmeritorious claims." Id. at 168-69.
 
 
 29
 A more pertinent precedent is Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which concerned the adequacy of pleading a Title VII complaint. The Court rejected what had been this Circuit's rule requiring employment discrimination plaintiffs to allege facts constituting a prima facie case of employment discrimination. See id. at 515, 122 S.Ct. 992. The Court again emphasized that the judicially imposed heightened pleading standard conflicted with Rule 8(a) and that a heightened pleading standard could be attained only "by the process of amending the Federal Rules, and not by judicial interpretation." Id. (internal quotation marks omitted).
 
 
 30
 Leatherman and especially Swierkiewicz—with their insistence that courts cannot impose heightened pleading standards in the absence of statutory authorization— indicate that a court cannot impose a heightened pleading standard in Bivens (or other civil rights) actions against individual officials, a precept we have heeded since the Supreme Court's decision in Swierkiewicz. See, e.g., Phillip v. University of Rochester, 316 F.3d 291, 298-99 (2d Cir.2003) (general allegation of racial animus); Phelps v. Kapnolas, 308 F.3d 180, 186-87 (2d Cir.2002) (general allegation of knowledge).
 
 
 31
 However, a third Supreme Court case, decided between Leatherman and Swierkiewicz, cryptically suggests that, in some circumstances, a court could require "specific, nonconclusory factual allegations" at the pleading stage in claims against government officials. In Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), the D.C. Circuit had recognized a heightened burden of proof in cases against government officials alleging unconstitutional motive. See id. at 582-83, 118 S.Ct. 1584. The Court observed that the D.C. Circuit had adopted the heightened standard in an attempt "to address a potentially serious problem: Because an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on improper intent may be less amenable to summary disposition than other types of claims against government officials." Id. at 584-85, 118 S.Ct. 1584 (internal quotation marks omitted). Although the Supreme Court recognized this problem, it rejected the heightened standard of proof.
 
 
 32
 The Court held that the D.C. Circuit's rule was not compelled by either the holding or the reasoning of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In Harlow, the Court had stated that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." Id. at 817-18, 102 S.Ct. 2727. However, as the Court explained in Crawford-El, this statement merely concerned a plaintiff's attempt to overcome a legitimate qualified immunity defense by alleging malicious intent; this holding was irrelevant to a plaintiff's burden in alleging a constitutional violation of which improper motive is an essential element. See 523 U.S. at 588-89, 118 S.Ct. 1584. Neither did Harlow's reasoning require a heightened burden of proof: the Court observed that there existed other mechanisms for protecting officials from unmeritorious actions, such as the requirement that the officials' conduct violate clearly established law, the need to prove causation, and procedural protections. See id. at 590-93.
 
 
 33
 The Court acknowledged that the usual pleading standard would sometimes not preclude at least limited discovery to amplify general allegations. The Court observed that Harlow only "sought to protect officials from the costs of `broad-reaching' discovery" and that limited discovery is sometimes necessary to adjudicate a qualified immunity defense. See id. at 593 n. 14, 102 S.Ct. 2727. The Court concluded by observing that "broad discretion" in the discovery process is more "useful and equitable" than categorical rules such as that of the D.C. Circuit. See id. at 601.
 
 
 34
 What Crawford-El gave civil rights plaintiffs with respect to traditional notice pleading, however, it might have modified by permitting some post-complaint detailing of a claim. In discussing the procedural mechanisms available to judges in civil rights actions, at least those alleging wrongful motive, the Court observed that, before permitting discovery, a court could require a plaintiff to "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment." Id. at 598, 118 S.Ct. 1584 (internal quotation marks omitted). Perhaps significantly, the Court quoted the phrase "put forward specific, nonconclusory factual allegations" from Justice Kennedy's concurring opinion in Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), in which he had explicitly advocated a heightened pleading standard for civil rights actions requiring a showing of malice. See id. at 235-36, 111 S.Ct. 1789 ("There is tension between the rationale of Harlow and the requirement of malice, and it seems to me that the heightened pleading requirement is the most workable means to resolve it.").
 
 
 35
 The First Circuit has remarked that "[w]hatever window of opportunity [it] thought remained open after Crawford-El has been slammed shut by the Supreme Court's subsequent decision in Swierkiewicz." Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61, 65 (1st Cir.2004). Most Circuits appear to have rejected a heightened pleading standard. See Doe v. Cassel, 403 F.3d 986, 988-89 & n. 3 (8th Cir.2005) (collecting cases); Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125 (9th Cir.2002) (same).
 
 
 36
 Considerable uncertainty concerning the standard for assessing the adequacy of pleadings has recently been created by the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). If we were to consider only a narrow view of the holding of that decision, we would not make any adjustment in our view of the applicable pleading standard. Bell Atlantic held that an allegation of parallel conduct by competitors, without more, does not suffice to plead an antitrust violation under 15 U.S.C. § 1. See id. at 1961. The Court required, in addition, "enough factual matter (taken as true) to suggest that an agreement was made." Id. at 1965. However, the Court's explanation for its holding indicated that it intended to make some alteration in the regime of pure notice pleading that had prevailed in the federal courts ever since Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), was decided half a century ago. The nature and extent of that alteration is not clear because the Court's explanation contains several, not entirely consistent, signals, which we consider (not necessarily in the order set forth in the Court's opinion).
 
 
 37
 Some of these signals point toward a new and heightened pleading standard. First, the Court explicitly disavowed the oft-quoted statement in Conley of "`the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Bell Atlantic, 127 S.Ct. at 1968 (quoting Conley, 355 U.S. at 45-46, 78 S.Ct. 99). Bell Atlantic asserted that this "no set of facts" language "has earned its retirement" and "is best forgotten." Id. at 1969.
 
 
 38
 Second, the Court, using a variety of phrases, indicated that more than notice of a claim is needed to allege a section 1 violation based on competitors' parallel conduct. For example, the Court required "enough factual matter (taken as true) to suggest that an agreement was made," id. at 1965; "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," id.; "facts that are suggestive enough to render a § 1 conspiracy plausible," id.; "allegations of parallel conduct ... placed in a context that raises a suggestion of a preceding agreement," id. at 1966; "allegations plausibly suggesting (not merely consistent with) agreement," id.; a "plain statement" (as specified in Rule 8(a)(2)) with "enough heft" to show entitlement to relief, id.; and "enough facts to state a claim to relief that is plausible on its face," id. at 1974, and also stated that the line "between the factually neutral and the factually suggestive ... must be crossed to enter the realm of plausible liability," id. at 1966 n. 5, and that "the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible," id. at 1973 n. 14.
 
 
 39
 Third, the Court discounted the ability of "`careful case management,'" "to weed[] out early in the discovery process" "a claim just shy of a plausible entitlement." Id. at 1967 (quoting id. at 1975 (Stevens, J., dissenting)).
 
 
 40
 Fourth, the Court encapsulated its various formulations of what is required into what it labeled "the plausibility standard." Id. at 1968. Indeed, the Court used the word "plausibility" or an adjectival or adverbial form of the word fifteen times (not counting quotations).
 
 
 41
 On the other hand, some of the Court's linguistic signals point away from a heightened pleading standard and suggest that whatever the Court is requiring in Bell Atlantic might be limited to, or at least applied most rigorously in, the context of either all section 1 allegations or perhaps only those section 1 allegations relying on competitors' parallel conduct. First, the Court explicitly disclaimed that it was "requir[ing] heightened fact pleading of specifics," id. at 1974, and emphasized the continued viability of Swierkiewicz, see id. at 1973-74, which had rejected a heightened pleading standard. See also Erickson v. Pardus, ___ U.S. ___, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing Bell Atlantic's citation of Swierkiewicz).
 
 
 42
 Second, although the Court faulted the plaintiffs' complaint for alleging "merely legal conclusions" of conspiracy, Bell Atlantic, 127 S.Ct. at 1970, it explicitly noted with approval Form 9 of the Federal Civil Rules, Complaint for Negligence, which, with respect to the ground of liability, alleges only that the defendant "negligently drove a motor vehicle against plaintiff who was then crossing [an identified] highway," Fed.R.Civ.P.App. Form 9. See Bell Atlantic, 127 S.Ct. at 1970 n. 10. The Court noted that Form 9 specifies the particular highway the plaintiff was crossing and the date and time of the accident, see id., but took no notice of the total lack of an allegation of the respects in which the defendant is alleged to have been negligent, i.e., driving too fast, crossing the center line, running a traffic light or stop sign, or even generally failing to maintain a proper lookout. The adequacy of a generalized allegation of negligence in the approved Form 9 seems to weigh heavily against reading Bell Atlantic to condemn the insufficiency of all legal conclusions in a pleading, as long as the defendant is given notice of the date, time, and place where the legally vulnerable conduct occurred.
 
 
 43
 Third, the Court placed heavy emphasis on the "sprawling, costly, and hugely time-consuming" discovery that would ensue in permitting a bare allegation of an antitrust conspiracy to survive a motion to dismiss, see id. at 1967 n. 6, and expressed concern that such discovery "will push cost-conscious defendants to settle even anemic cases," id. at 1967. These concerns provide some basis for believing that whatever adjustment in pleading standards results from Bell Atlantic is limited to cases where massive discovery is likely to create unacceptable settlement pressures.
 
 
 44
 Fourth, although the Court expressed doubts about the ability of district courts to "weed[] out" through case management in the discovery process "a claim just shy of a plausible entitlement to relief," id. (emphasis added), the Court did not disclaim its prior statement that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." Leatherman, 507 U.S. at 168-69, 113 S.Ct. 1160 (emphasis added).[5] Leaving Leatherman and Crawford-El undisturbed (compared to the explicit disavowal of the "no set of facts" language of Conley) further suggests that Bell Atlantic, or at least its full force, is limited to the antitrust context.
 
 
 45
 Fifth, just two weeks after issuing its opinion in Bell Atlantic, the Court cited it for the traditional proposition that "[s]pecific facts are not necessary [for a pleading that satisfies Rule 8(a)(2)]"; the statement need only "`give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson, 127 S.Ct. at 2200 (quoting Bell Atlantic's quotation from Conley) (omission in original).
 
 
 46
 These conflicting signals create some uncertainty as to the intended scope of the Court's decision.[6] We are reluctant to assume that all of the language of Bell Atlantic applies only to section 1 allegations based on competitors' parallel conduct or, slightly more broadly, only to antitrust cases.[7] Some of the language relating generally to Rule 8 pleading standards seems to be so integral to the rationale of the Court's parallel conduct holding as to constitute a necessary part of that holding. See Pierre N. Leval, Judging under the Constitution: Dicta about Dicta, 81 N.Y.U. L.Rev. 1249, 1257 (2006) ("The distinction [between holding and dictum] requires recognition of what was the question before the court upon which the judgment depended, how (and by what reasoning) the court resolved the question, and what role, if any, the proposition played in the reasoning that led to the judgment.").
 
 
 47
 After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. We will say more about this approach as we apply it below to some of the Plaintiff's specific allegations.
 
 
 48
 Notwithstanding what we understand to be the essential message of Bell Atlantic, we acknowledge that we see some merit in the argument in favor of a heightened pleading standard in this case for two reasons. First, qualified immunity is a privilege that is essential to the ability of government officials to carry out their public roles effectively without fear of undue harassment by litigation. In this respect, the factors favoring a heightened pleading standard to overcome a qualified immunity defense are distinguishable from the purely prudential and policy-driven factors that the Supreme Court found inadequate to justify a heightened pleading standard in the Title VII context. See Swierkiewicz, 534 U.S. at 514-15, 122 S.Ct. 992.
 
 
 49
 Second, some of the allegations in the Plaintiff's complaint, although not entirely conclusory, suggest that some of the Plaintiff's claims are based not on facts supporting the claim but, rather, on generalized allegations of supervisory involvement. Therefore, allowing some of the Plaintiff's claims to survive a motion to dismiss might facilitate the very type of broad-ranging discovery and litigation burdens that the qualified immunity privilege was intended to prevent.
 
 
 50
 Nevertheless, although Swierkiewicz was decided in the context of Title VII, we are mindful of the Supreme Court's statement in that decision that heightened pleading requirements "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." Id. at 515, 122 S.Ct. 992 (internal quotation marks omitted). Absent any indication from the Supreme Court that qualified immunity might warrant an exception to this general approach and the explicit disclaimer of a heightened pleading standard in Bell Atlantic, reinforced by the reversal of the Tenth Circuit's use of a heightened pleading standard in Erickson, we conclude that a heightened pleading rule may not be imposed. However, in order to survive a motion to dismiss under the plausibility standard of Bell Atlantic, a conclusory allegation concerning some elements of a plaintiff's claims might need to be fleshed out by a plaintiff's response to a defendant's motion for a more definite statement. See Fed.R.Civ.P. 12(e). In addition, even though a complaint survives a motion to dismiss, a district court, while mindful of the need to vindicate the purpose of the qualified immunity defense by dismissing non-meritorious claims against public officials at an early stage of litigation, may nonetheless consider exercising its discretion to permit some limited and tightly controlled reciprocal discovery so that a defendant may probe for amplification of a plaintiff's claims and a plaintiff may probe such matters as a defendant's knowledge of relevant facts and personal involvement in challenged conduct. In a case such as this where some of the defendants are current or former senior officials of the Government, against whom broad-ranging allegations of knowledge and personal involvement are easily made, a district court might wish to structure such limited discovery by examining written responses to interrogatories and requests to admit before authorizing depositions, and by deferring discovery directed to high-level officials until discovery of front-line officials has been completed and has demonstrated the need for discovery higher up the ranks. If discovery directed to current or former senior officials becomes warranted, a district court might also consider making all such discovery subject to prior court approval.
 
 
 51
 We note that Rule 8(a)'s liberal pleading requirement, when applied mechanically without countervailing discovery safeguards, threatens to create a dilemma between adhering to the Federal Rules and abiding by the principle that qualified immunity is an immunity from suit as well as from liability. Therefore, we emphasize that, as the claims surviving this ruling are litigated on remand, the District Court not only may, but "must exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that officials [or former officials] are not subjected to unnecessary and burdensome discovery or trial proceedings." Crawford-El, 523 U.S. at 597-98, 118 S.Ct. 1584 (emphasis added). In addition, the District Court should provide ample opportunity for the Defendants to seek summary judgment if, after carefully targeted discovery, the evidence indicates that certain of the Defendants were not sufficiently involved in the alleged violations to support a finding of personal liability, or that no constitutional violation took place. See Harlow, 457 U.S. at 821, 102 S.Ct. 2727 (Brennan, J., concurring) ("[S]ummary judgment will also be readily available whenever the plaintiff cannot prove, as a threshold matter, that a violation of his constitutional rights actually occurred."). We give these matters additional consideration below with respect to particular claims.
 
 
 52
 (f) The post-9/11 context. Several Defendants contend that even if the Plaintiff's complaint would survive a motion to dismiss in the face of a qualified immunity defense under normal circumstances, the post-9/11 context requires a different outcome. This argument is advanced on three fronts. First, some Defendants contend that the Government was entitled to take certain actions that might not have been lawful before 9/11 because the Government's interests assumed special weight in the post-9/11 context. Second, some Defendants contend that, even if the law was clearly established as to the existence of a right claimed to have been violated, it was not clearly established in the extraordinary circumstances of the 9/11 attack and its aftermath. Third, some Defendants contend that the post-9/11 context renders their actions objectively reasonable, an argument we do not reach in view of our disposition of their second contention.
 
 
 53
 We fully recognize the gravity of the situation that confronted investigative officials of the United States as a consequence of the 9/11 attack. We also recognize that some forms of governmental action are permitted in emergency situations that would exceed constitutional limits in normal times. See Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 425-26, 54 S.Ct. 231, 78 L.Ed. 413 (1934) ("While emergency does not create power, emergency may furnish the occasion for the exercise of power."). But most of the rights that the Plaintiff contends were violated do not vary with surrounding circumstances, such as the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination. The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times.
 
 
 54
 With some rights, for example, the right to be free from unreasonable searches, the existence of exigent circumstances might justify governmental action that would not otherwise be permitted. See, e.g., Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (exigent circumstances permitted warrantless entry into home). But, as we discuss below, see Part VI, the exigent circumstances of the post-9/11 context do not diminish the Plaintiff's right not to be needlessly harassed and mistreated in the confines of a prison cell by repeated strip and body-cavity searches. This and other rights, such as the right to be free from use of excessive force and not to be subjected to ethnic or religious discrimination, were all clearly established prior to 9/11, and they remained clearly established even in the aftermath of that horrific event. To whatever extent exigent circumstances might affect the lawfulness of the Defendants' actions or might have justified an objectively reasonable belief that their actions did not violate clearly established law, we consider the argument in connection with a particular claim.
 
 
 55
 With these general principles in mind, we turn to the Plaintiff's specific claims.
 
 II. Procedural Due Process
 
 56
 The Plaintiff alleges that Ashcroft and Mueller, the FBI Defendants, the BOP Defendants, and Hasty adopted a policy under which he was deprived of a liberty interest without any of the procedural protections required by due process of law. His allegation of the deprivation of a liberty interest, even while lawfully confined without bail on criminal charges, is based on his placement in solitary confinement, where he was subjected to needlessly harsh restrictions that were atypical and significant when compared to those in the rest of the MDC population. The Defendants contend that (1) the Plaintiff did not allege that the confinement was punitive; (2) no procedural due process right was violated because the Plaintiff did not have a liberty interest in avoiding extended confinement in the ADMAX SHU and, even if he did, he received all the process that was due; (3) even if the Plaintiff's procedural due process right was violated, the contours of this right were not clearly established at the time of the events in question; (4) the Defendants' actions were objectively reasonable in the post-9/11 context; and (5) the Plaintiff has failed to allege personal involvement.
 
 
 57
 We are required by the Supreme Court's decision in Saucier to assess these arguments within a two-part framework, asking first whether the alleged facts show a violation of a constitutional right, see Saucier, 533 U.S. at 201, 121 S.Ct. 2151, and, if so, "whether the right was clearly established ... in light of the specific context of the case," see id. The first, second, and fifth of the Defendants' arguments bear on the initial issue of whether a violation has been alleged; the third argument—whether the right was clearly established—is precisely the second issue under Saucier; and the fourth argument is often a further component of a qualified immunity defense because even if the law was clearly established, it might have been objectively reasonable, on the facts of a particular case, for a defendant to believe that the actions taken did not violate that established law, see Johnson, 239 F.3d at 250.
 
 
 58
 (a) Has a Violation of a Procedural Due Process Right Been Adequately Pleaded?
 
 
 59
 In assessing the adequacy of the Plaintiff's pleading of a procedural due process violation we first consider the basic question of whether the Plaintiff has pleaded the existence of a liberty interest and entitlement to procedures that were not provided and then consider the Defendants' arguments that punitive intent and personal involvement were not adequately pleaded.
 
 
 60
 (i) The Plaintiff's procedural due process right. In concluding that the Plaintiff had a protected liberty interest, Judge Gleeson relied on this Court's decision in Tellier v. Fields, 280 F.3d 69 (2d Cir.2000). See Dist. Ct. op. at *17-*18. In Tellier, a federal inmate allegedly was placed in administrative detention in the SHU for more than 500 days without being informed of the reasons for his placement or receiving any hearings. See 280 F.3d at 74. The regulations governing administrative segregation, 28 C.F.R. § 541.22, entitle inmates to "an administrative detention order detailing the reasons for placing an inmate in administrative detention. provided institutional security is not compromised thereby." 28 C.F.R. § 541.22(b). Moreover, the regulations require a Segregation Review Officer to "hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter ... hold a hearing and review these cases formally at least every 30 days." Id. § 541.22(c)(1). The regulations specifically provide that administrative detention "is to be used only for short periods of time except ... where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns." Id.
 
 
 61
 In assessing whether a prisoner had a protected liberty interest in avoiding administrative segregation, Tellier looked to Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), in which the Supreme Court held that state-created liberty interests of prisoners were limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 483-84, 115 S.Ct. 2293. Since Sandin, the rule in this Circuit has been that a prisoner has a protected liberty interest "`only if the deprivation ... is atypical and significant and the state has created the liberty interest by statute or regulation.'" Tellier, 280 F.3d at 80 (quoting Sealey v. Giltner, 116 F.3d 47, 52 (2d Cir.1997)) (omission in original); see also Palmer v. Richards, 364 F.3d 60, 64 & n. 2 (2d Cir.2004).
 
 
 62
 Numerous cases in this Circuit have discussed the "atypical and significant hardship" prong of Sandin. Relevant factors include both the conditions of segregation and its duration. See Palmer, 364 F.3d at 64. Segregation of longer than 305 days in standard SHU conditions is sufficiently atypical to require procedural due process protection under Sandin. See id. at 65 (citing Colon v. Howard, 215 F.3d 227, 231 (2d Cir.2000)). When confinement is of an intermediate duration—between 101 and 305 days—"`development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." Id. at 64-65 (quoting Colon, 215 F.3d at 232).
 
 
 63
 Applying these standards, Tellier first observed that the prisoner had alleged confinement of more than 500 days "under conditions that differ markedly from those in the general population," finding this sufficient to allege "atypical and significant" hardships. 280 F.3d at 80. Turning to the language of the regulations, the Court agreed that because the initial decision to place a prisoner in administrative detention is a discretionary one, the plaintiff did not have a "protected liberty interest that is violated when the Warden removes him or her from the general population." Id. at 82. However, the Court found, the regulations constrain the warden's discretion in maintaining a prisoner in detention and the procedures "are designed to ensure that a prisoner is kept in SHU for no longer than is necessary." Id. at 82-83. Accordingly, the Court concluded that section 541.22 "creates a protectable liberty interest when an official's failure to adhere to the [regulation] results in an atypical, significant deprivation." Id. at 83 (internal quotation marks omitted).
 
 
 64
 Relying on Tellier, Judge Gleeson concluded that the Plaintiff had a clearly established protectable liberty interest in avoiding continued detention in the ADMAX SHU. See Dist. Ct. op. at *18. On appeal, the Defendants contend that Tellier is no longer good law in light of the Supreme Court's recent opinion in Wilkinson v. Austin, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). In Wilkinson, the Supreme Court considered Sandin's application to segregation in Ohio's Supermax facility. Inmates in the Supermax facility were detained in solitary confinement indefinitely, they remained in their cells 23 hours a day, the lights were turned on constantly, they could not go outside for recreation, and they were limited to non-contact visits. See id. at 214-15, 125 S.Ct. 2384. The Court confirmed Sandin's holding that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in Sandin," id. at 222, 125 S.Ct. 2384, but observed that "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life," id. at 223, 125 S.Ct. 2384 (internal quotation marks omitted). The Court recognized that the courts of appeals had struggled to identify a baseline for determining what constitutes an atypical and significant hardship, but it concluded that confinement in the Supermax facility "imposes an atypical and significant hardship under any plausible baseline." Id. Having found that the prisoner had a protected liberty interest, the Court concluded that Ohio's "informal, nonadversary procedures" were sufficient to satisfy due process requirements. Id. at 228-29, 125 S.Ct. 2384.
 
 
 65
 The Defendants argue that Wilkinson abrogates Tellier or that it at least renders the relevant standard unclear because it instructs courts to consider the nature of the conditions, not the requirements of the regulations. We disagree for two reasons. First, while Wilkinson instructs courts to focus on the nature of the conditions, it nonetheless explains that the "liberty interest in avoiding particular conditions of confinement . . . arise[s] from state policies or regulations." Id. at 222, 125 S.Ct. 2384. Following Tellier, Judge Gleeson looked to the duration and conditions of confinement, as instructed by Wilkinson. See Dist. Ct. op. at *18.
 
 
 66
 Second, and more significantly, for at least half (if not all) of the Plaintiff's confinement in the ADMAX SHU, he was a pretrial detainee, not a convicted prisoner.[8] This Court has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process. See Benjamin v. Fraser, 264 F.3d 175, 188-89 (2d Cir.2001) ("Benjamin I"). In Benjamin I, this Court affirmed the district court's ruling that the imposition of painful physical restraints during the movement of pretrial detainees required "reasonable after-the-fact procedural protections to ensure that such restrictions on liberty [would] be terminated reasonably soon if they [had] no justification." Id. at 188.
 
 
 67
 In sum, Wilkinson does not affect the validity of Judge Gleeson's ruling that the Plaintiff had a protected liberty interest because (1) he considered the Plaintiff's allegations of atypical and significant hardships and (2) the Wilkinson and Sandin analysis does not apply to the interval of the Plaintiff's pretrial detention. Under this Court's case law, the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement, which he sufficiently alleges to have been severe. Even under Wilkinson, the conditions under which the Plaintiff alleges that he was confined—solitary confinement, repeated strip and body-cavity searches, beatings, exposure to excessive heat and cold, very limited exercise, and almost constant lighting—as well as the initially indefinite duration of confinement could be found to constitute atypical and significant hardships. See 545 U.S. at 223-24, 125 S.Ct. 2384. The Plaintiff has alleged a protected liberty interest in avoiding more than six months' detention in the ADMAX SHU, especially in light of his status as a pretrial detainee.
 
 
 68
 The Defendants also dispute the violation of a procedural due process right by arguing that, even if the Plaintiff had a protected liberty interest in avoiding extended detention in the ADMAX SHU, he received all the process that was due by virtue of the FBI's review. This argument is unavailing at this preliminary stage of the litigation. In Wilkinson, the Supreme Court applied the familiar balancing test of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine whether the plaintiff received adequate procedural protections. See 545 U.S. at 224-25, 125 S.Ct. 2384. Under the second prong of this test, the Court observed that inmates received "notice of the factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal," stating that "these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." Id. at 225-26, 125 S.Ct. 2384. After weighing all the relevant factors, the Court found that "[w]here the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, . . . informal, nonadversary procedures" were sufficient. Id. at 228-29, 125 S.Ct. 2384. In the pending case, the Plaintiff alleges that he did not even receive notice of the factual grounds on which he was being detained in the ADMAX SHU nor did he have any opportunity for rebuttal.
 
 
 69
 We recognize that in the post-9/11 context the first Mathews factor—the gravity of the Government's interest—is appropriately accorded more weight than would otherwise be warranted. It might be that the combination of (1) the Plaintiff's interest in avoiding confinement under harsh conditions, (2) the risk of an erroneous determination of the need for such confinement, and (3) accorded added weight in the post-9/11 context, would, on balance, lead to the conclusion that the Government need not have given the Plaintiff notice and a chance for rebuttal before placing him in the ADMAX SHU. However, once it became clear that the Plaintiff was going to be confined in the ADMAX SHU for an extended period of time, some process was required. We cannot say in the absence of a developed factual record whether the FBI's clearance procedure comported with the requirements of the Due Process Clause as interpreted in Mathews and subsequent cases. The sparse record thus far developed provides no indication as to what security-related steps the Defendants were taking that might justify prolonged confinement. Nor does that record indicate in what respect providing the Plaintiff with some notice of the basis for his separation in the ADMAX SHU and affording some opportunity for rebuttal would have impaired national security interests or legitimate penological interests of the Government. The Government has not as yet had an opportunity to refute the Plaintiff's allegation that there was no evidence connecting him to terrorism. Accordingly, we cannot say whether the Government's national security interests rendered the clearance procedure sufficient to satisfy procedural due process requirements or whether more traditional procedural protections were required. Nevertheless, because we are required at this stage of the litigation to accept all of the Plaintiff's allegations as true and draw all reasonable inferences in his favor, we cannot say that the Plaintiff has failed to plead a viable claim under the procedural component of the Due Process Clause. Judge Gleeson dismissed the Plaintiff's procedural due process claim with respect to the initial confinement in the ADMAX SHU, Dist. Ct. op. at *17 n. 18, but properly ruled that the Plaintiff had stated a procedural due process claim with respect to his continued confinement, see id. at *18-*19.
 
 
 70
 (ii) Punitive intent. Ashcroft, Mueller, and Hasty, citing Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), contend that the Plaintiff has not stated a claim that the confinement in the ADMAX SHU violated his procedural due process rights because he has not alleged that the confinement was punitive. Preliminarily, we note that the complaint alleges that the Defendants designed a policy under which the Plaintiff was "arbitrarily designated to be confined in the ADMAX SHU" and that "[k]eeping Plaintiff[] in isolation ... amounted to the willful, malicious, and unnecessary infliction of pain and suffering." This is sufficient to allege that the confinement was punitive in nature.
 
 
 71
 More fundamentally, however, we deem unsupportable the Defendants' premise that the Plaintiff's procedural due process claim requires an allegation of punitive intent. Defendants Ashcroft and Mueller cite Wolfish, 441 U.S. at 535, 99 S.Ct. 1861, for the proposition that "in evaluating the constitutionality of conditions or restrictions of pretrial detention, the proper inquiry under the Due Process Clause is whether the conditions `amount to punishment of the detainee.'" However, Wolfish did not involve a claim that inadequate procedures had been used to impose challenged conditions of confinement. The claim there was that the challenged conditions of confinement, being punitive, could not be imposed on pretrial detainees at all because they had not been convicted. Although the Court did not consider the challenged conditions punitive, it ruled that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Id. This ruling implements the substantive component of the Due Process Clause.[9]
 
 
 72
 By contrast, the relevant line of authority for the Plaintiff's procedural due process claim begins with Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and continues through Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and Sandin, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418. Wolff outlined fairly extensive procedures that must be observed before a prisoner's liberty interest in retaining good time credits could be impaired because of disciplinary violations. 418 U.S. at 563-72, 94 S.Ct. 2963. Helms required only notice of charges and an opportunity to rebut in order to place a prisoner in administrative segregation pending an investigation of misconduct charges. 459 U.S. at 476, 103 S.Ct. 864. Sandin modified Helms by making the existence of a prisoner's liberty interest turn primarily on the atypical nature of the challenged conditions of confinement, 515 U.S. at 483-87, 115 S.Ct. 2293, but did not alter the basic requirement that where a prisoner's liberty interest exists, its impairment requires some procedural protections.
 
 
 73
 The Plaintiff's liberty interest, based primarily on a federal regulation, is entitled to some procedural protection regardless of punitive intent. To the extent that the interest derives directly from the Due Process Clause (and hence requires procedural protection only when punishment is imposed, see Wolfish, 441 U.S. at 535, 99 S.Ct. 1861), the harsh conditions set forth in the complaint adequately meet the criteria for punishment, see Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), whether or not such conditions were imposed with punitive intent.
 
 
 74
 (iii) Lack of personal involvement. Defendants Ashcroft and Mueller contend that the Plaintiff has not adequately alleged their personal involvement in the denial of procedural due process because the continued detention decision was made by FBI subordinates. Applying the standards applicable to personal involvement outlined above, we reject this claim at this stage of the litigation. Ashcroft and Mueller are alleged to have condoned the policy under which the Plaintiff was held in harsh conditions of confinement until "cleared" by the FBI. Since the complaint adequately alleges, for purposes of a motion to dismiss, that procedural due process required some procedures beyond FBI clearance, the allegation of condoning the policy of holding the Plaintiff in the ADMAX SHU until cleared suffices, at the pleading stage, to defeat dismissal for lack of personal involvement.
 
 
 75
 At the other end of the leadership chain, Defendant Hasty asserts his lack of personal involvement because the continued detention decision was made far above his level of responsibility. But this defense also cannot prevail at this stage of the litigation. Cf. Anthony v. City of New York, 339 F.3d 129, 138 (2d Cir.2003) ("Plausible instructions from a superior ... support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g.[,] . . . exigent circumstances)." (internal quotation marks omitted)). Hasty is alleged to have known of the continued detention in the ADMAX SHU and the absence of procedural protections for the Plaintiff. Whether his conduct as a subordinate was objectively reasonable under all the circumstances is an issue distinct from the adequacy of the pleading of personal involvement.
 
 
 76
 Between these extremes in the official hierarchy, the lack of adequate allegations of personal knowledge of, or involvement in, the Plaintiff's continued detention is also asserted by the FBI Defendants and the BOP Defendants. However, the complaint at least implicitly alleges the knowledge of the FBI Defendants by stating that they "failed to approve post-September 11 detainees' release to general population." With respect to the BOP Defendants, the complaint alleges that BOP Defendant Cooksey "directed that all detainees `of high interest' be confined in the most restrictive conditions possible until cleared by the FBI," that BOP Defendant Sawyer approved this policy, and that BOP Defendant Rardin, along with others, designed the policy of arbitrary confinement in the ADMAX SHU. The FBI Defendants also dispute their personal involvement in a procedural due process violation by arguing that they could not reasonably be expected to know about the BOP regulations. However, some factual development of this claim would have to precede its determination. Moreover, even absent the FBI Defendants' knowledge of the BOP regulation, the complaint can support the inference that the FBI Defendants understood that their alleged role in the clearance procedure was linked to a detainee's release to the general population. This suffices to overcome the defense of no personal involvement at this stage of the litigation.
 
 
 77
 It is arguable that, under the plausibility standard of Bell Atlantic, some subsidiary facts must be alleged to plead adequately that Ashcroft and Mueller condoned the Plaintiff's continued confinement in the ADMAX SHU, that Hasty had knowledge of that confinement, or that the mid-level Defendants knew the relationship between their clearance procedure and the Plaintiff's release to the general population. However, all of the Plaintiff's allegations respecting the personal involvement of these Defendants are entirely plausible, without allegations of additional subsidiary facts. This is clearly so with respect to Hasty and the mid-level Defendants. Even as to Ashcroft and Mueller, it is plausible to believe that senior officials of the Department of Justice would be aware of policies concerning the detention of those arrested by federal officers in the New York City area in the aftermath of 9/11 and would know about, condone, or otherwise have personal involvement in the implementation of those policies. Sustaining the adequacy of a pleading of personal involvement in these circumstances runs no risk that every prisoner complaining of a denial of rights while in federal custody anywhere in the United States can survive a motion to dismiss simply by alleging that the Attorney General knew of or condoned the alleged violation. And, like the Form 9 complaint approved in Bell Atlantic, Iqbal's complaint informs all of the Defendants of the time frame and place of the alleged violations.
 
 
 78
 (b) Was the Plaintiff's Right to Procedural Due Process Clearly Established?
 
 
 79
 Although we conclude that the Plaintiff has adequately pleaded a violation of a procedural due process right, we also conclude that in this case "officers of reasonable competence could [have] disagree[d]," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), whether their conduct violated a clearly established procedural due process right. Accordingly, the Plaintiff's right to additional procedures was not clearly established with the level of specificity that is required to defeat a qualified immunity defense. See Brosseau v. Haugen, 543 U.S. 194, 199-200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).
 
 
 80
 Several factors combine to create this lack of clarity in prior case law. First, some uncertainty exists in determining when administrative segregation procedures are required even in the ordinary criminal context. Our case law would require an officer in the Defendants' situation to consider various factors including the length of the Plaintiff's confinement, the extent to which the conditions of confinement were atypical, the text of relevant BOP regulations, and the Plaintiff's status as a pretrial detainee. See, e.g., Tellier, 280 F.3d at 79-83. As noted above, no single factor is dispositive in this case, which concerns administrative segregation of approximately six months. Although the harshness of the conditions alleged weigh in favor of requiring procedural protections, an officer could reasonably note that the Plaintiff's six-month continued confinement was comparable to the duration of confinements in cases that we characterized in Tellier as involving "relatively brief periods of confinement." See id. at 85.
 
 
 81
 Second, uncertainty in existing case law is heightened by the fact that, even on the facts alleged in the complaint, which specified that the "of high interest" designation pertained to the Government's post-9/11 terrorism investigation, the investigation leading to the Plaintiff's separation from the general prison population could be reasonably understood by all of the Defendants to relate to matters of national security, rather than an ordinary criminal investigation. Prior to the instant case, neither the Supreme Court nor our Court had considered whether the Due Process Clause requires officials to provide ordinary administrative segregation hearings to persons detained under special conditions of confinement until cleared of connection with activities threatening national security. Cf. Forsyth, 472 U.S. at 534-35, 105 S.Ct. 2806 (granting Attorney General qualified immunity for warrantless wiretapping for national security purposes despite prohibitions of warrantless wiretapping in criminal context).
 
 
 82
 Third, the BOP regulation on which the Plaintiff relies itself contains potentially relevant exceptions that undermine certainty as to established requirements of law. "Administrative detention is to be used only for short periods of time except ... where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns," 28 C.F.R. § 541.22(c)(1) (emphasis added), and inmates are entitled to "an administrative detention order detailing the reasons for placing an inmate in administrative detention ... provided institutional security is not compromised thereby," id. § 541.22(b) (emphasis added).
 
 
 83
 In sum, these factors, taken together, would suffice to raise "a legitimate question," Forsyth, 472 U.S. at 535 n. 12, 105 S.Ct. 2806, among Government officials as to whether the Due Process Clause required administrative segregation hearings or any procedures other than the FBI's clearance system. See id. ("[W]here there is a legitimate question whether an exception to [a constitutional requirement] exists," failure to abide by the requirement "cannot be said [to have] violate[d] clearly established law." (emphasis added)). Accordingly, we will direct dismissal of the portions of the Plaintiff's complaint alleging violations of procedural due process rights. See Compl. ¶¶ 204-06.
 
 III. Conditions of Confinement
 
 84
 Hasty contends that Judge Gleeson should have dismissed the Plaintiff's conditions of confinement claims against him on the ground of qualified immunity because (1) the Plaintiff did not allege conditions amounting to a violation of substantive due process rights, (2) the Plaintiff failed to allege Hasty's deliberate indifference to the maintenance of the conditions of confinement, and (3) Hasty's actions were objectively reasonable under the circumstances.[10]
 
 
 85
 Because the Plaintiff was a pretrial detainee during his detention in the ADMAX SHU, his challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause of the Fifth Amendment and not from the cruel and unusual punishment standards of the Eighth Amendment. See Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir.2003) ("Benjamin II"). Pretrial detainees have not been convicted of a crime and thus "may not be punished in any manner—neither cruelly and unusually nor otherwise." Id. at 49-50. Courts considering challenges to confinement brought by pretrial detainees must first consider whether the circumstances of the particular confinement render the confinement punitive; since some restraint is necessary to confine a pretrial detainee, not all uncomfortable conditions or restrictions are necessarily punitive. Id. at 50. In Bell v. Wolfish, supra, the seminal case on the substantive due process claims of pretrial detainees, the Supreme Court recognized the following factors as relevant to the determination of whether a condition of confinement is punitive:
 
 
 86
 "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned...."
 
 
 87
 441 U.S. at 537-38, 99 S.Ct. 1861 (quoting Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554). A court may infer that a condition of confinement is intended as punishment if it is not reasonably related to a legitimate government objective. See id. at 539, 99 S.Ct. 1861.
 
 
 88
 The complaint alleges, among other things, that MDC staff placed the Plaintiff in solitary confinement, deliberately subjected him to extreme hot and cold temperatures, shackled him every time he left his cell, and repeatedly subjected him to strip and body-cavity searches, and that these conditions were intended to be, and were in fact, punitive. Applying Wolfish, Judge Gleeson found these allegations sufficient to state a substantive due process claim, observing that whether the conditions were reasonably related to legitimate government objectives could not be determined on a motion to dismiss. See Dist. Ct. op. at *16.
 
 
 89
 Hasty contends that Judge Gleeson did not properly consider whether the Plaintiff alleged that he was "deprived of the minimal civilized measure of life's necessities" or whether Hasty was deliberately indifferent to the Plaintiff's health or safety. But this Court has never applied those standards in this context. In Benjamin II, we distinguished between challenges to disabilities imposed purposefully on pretrial detainees, which are analyzed under the Wolfish "punitive" inquiry, and pretrial detainees' challenges to prison environmental conditions. See 343 F.3d at 50. Recognizing that the "punitive" standard is neither required nor helpful in the context of environmental conditions, we adopted a modified version of the Eighth Amendment's deliberate indifference standard; we required a showing of deliberate indifference but stated that such indifference could be presumed from an absence of reasonable care. See id. We explicitly rejected analogies to the Eighth Amendment that would require a showing of wantonness on the part of the prison official, see id. at 51, or a showing that the alleged conditions were so inhumane as to constitute cruel and unusual punishment, see id. at 52 (citing Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).
 
 
 90
 The Plaintiff has alleged the purposeful infliction of restraints that were punitive in nature. Accordingly, the District Court need not have considered whether a Defendant was "deliberately indifferent" in inflicting the restraints or whether the restraints constituted cruel and unusual punishment. The right of pretrial detainees to be free from punitive restraints was clearly established at the time of the events in question, and no reasonable officer could have thought that he could punish a pretrial detainee by subjecting him to the practices and conditions alleged by the Plaintiff.
 
 
 91
 The Plaintiff alleges that Hasty (1) requested that certain officials develop procedures for the ADMAX SHU, (2) knew of the conditions of confinement to which Plaintiff was subjected, (3) approved the strip search policy, and (4) knew or should have known of the practice or custom of beating detainees. Under a notice pleading standard, reaffirmed in Bell Atlantic and Erickson, these allegations are sufficient to state a claim that Hasty failed to remedy constitutional violations of which he was aware. Moreover, the general allegations of knowledge, which are sufficient under Phelps, cited above, see Part I(e), are bolstered by the allegation that Hasty directed other officers to set up procedures for the ADMAX SHU.
 
 
 92
 Hasty's final argument is that, even if the Plaintiff has pled the violation of a clearly established right, Hasty's actions were objectively reasonable in the post-9/11 context. He argues that the actions were taken "in the immediate aftermath of September 11th during the course of a large-scale investigation of unprecedented scope in United States history, and Plaintiff was, at that time, considered to be possibly complicit in the terrorist acts." As discussed above, see Part I(f), the post-9/11 context does not lessen the Plaintiff's right, as a pretrial detainee, to be free of punitive conditions of confinement.
 
 IV. Excessive Force
 
 93
 The only argument of a Defendant directed to the claim of excessive force is Hasty's contention that the complaint does not allege his personal involvement.
 
 
 94
 The complaint alleges that Hasty knew or should have known of the MDC practice of beating detainees in the ADMAX SHU, that he knew or should have known of the propensity of his subordinates to beat the Plaintiff unnecessarily, and that he was deliberately indifferent in failing to take action to curtail the beatings. The complaint also alleges that Hasty chose the officers who worked in the ADMAX SHU.
 
 
 95
 Applying the standards for supervisory liability, outlined above, see Part I(d), the Plaintiff's allegations, on a notice pleading standard, see Part I(e), suffice to state a claim of supervisory liability for the use of excessive force against the Plaintiff. See Phelps, 308 F.3d at 187 n. 6 ("[A] plaintiff's allegation of knowledge is itself a particularized factual allegation, which he will have the opportunity to demonstrate at the appropriate time in the usual ways." (internal quotation marks omitted)). The plausibility standard requires no subsidiary facts at the pleading stage to support an allegation of Hasty's knowledge because it is at least plausible that a warden would know of mistreatment inflicted by those under his command. Whether such knowledge can be proven must await further proceedings.
 
 V. Interference with Right to Counsel
 
 96
 Hasty argues that the Plaintiff did not adequately plead a violation of his Sixth Amendment right to counsel because (1) the complaint does not state that he was charged with criminal (as opposed to immigration) offenses and (2) he failed to plead supervisory involvement. Although, as Judge Gleeson observed, "the complaint could have been more transparent regarding plaintiffs' status as pretrial detainees facing criminal charges," see Dist. Ct. op. at *23, the complaint does refer to interference with the Plaintiff's conversations with his "criminal attorney." This allegation was sufficient to give Hasty "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47, 78 S.Ct. 99. As for the issue of supervisory liability, the complaint alleges that Hasty "knew of and condoned the imposition of substantial restrictions on Plaintiff's right to communicate with counsel." The Plaintiff's allegations of knowledge are sufficient to state a claim of supervisory liability, and, for the reasons stated above, satisfy the plausibility standard without an allegation of subsidiary facts.
 
 VI. Unreasonable Searches
 
 97
 Hasty challenges Judge Gleeson's conclusion that he is not entitled to qualified immunity at this stage on the Plaintiff's Fourth Amendment claim on the grounds that (1) the law on prisoners' Fourth Amendment right to be free from strip and body-cavity searches was not clearly established and (2) Judge Gleeson failed to explain why the searches of the Plaintiff did not serve legitimate penological interests.
 
 
 98
 As to whether the right to be free from strip and body-cavity searches was clearly established, Hasty argues that "the Circuits differ sharply on the existence of prisoner privacy rights under the Fourth Amendment outside of prison cells." This argument ignores the fact that it is this Circuit's law that determines whether a right is clearly established for purposes of a qualified immunity defense, see Tellier, 280 F.3d at 84, and Hasty does not reckon with the long line of Second Circuit cases on strip and body-cavity searches in prisons and jails. See, e.g., Shain v. Ellison, 273 F.3d 56 (2d Cir.2001); Covino v. Patrissi, 967 F.2d 73 (2d Cir.1992); Weber v. Dell, 804 F.2d 796 (2d Cir.1986).
 
 
 99
 Under the Saucier framework for considering a qualified immunity defense, discussed above, we must first decide whether, assuming the Plaintiff's allegations are true, his Fourth Amendment rights were violated, which will require determining the proper standard for his claim.
 
 
 100
 The Supreme Court has held that visual body-cavity searches of pretrial detainees and prisoners after contact visits are not unreasonable under the Fourth Amendment, even in the absence of probable cause. See Wolfish, 441 U.S. at 558, 99 S.Ct. 1861. Emphasizing that the Fourth Amendment prohibits only unreasonable searches, the Court instructed judges to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 558-59, 99 S.Ct. 1861. Because of the potential for smuggling money, drugs, and weapons into prisons, the Court concluded that the practice of strip searching inmates after contact visits was not facially unconstitutional. See id. at 559-60, 99 S.Ct. 1861. Applying Wolfish, this Court has concluded that, while it might be reasonable to strip search a prisoner before initially placing him in administrative detention, it would not be reasonable to conduct a second strip search shortly after the first search if the prisoner was under continuous escort the entire time. See Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir.1983).
 
 
 101
 Since Wolfish and Hodges, two lines of cases involving strip searches have evolved in this Circuit. In Weber v. Dell, jail officials conducted a visual body-cavity search on a woman arrested on misdemeanor charges. See 804 F.2d at 799. This Court ruled that
 
 
 102
 the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.
 
 
 103
 Id. at 802; see Wachtler v. County of Herkimer, 35 F.3d 77, 81 (2d Cir.1994) (accepting Weber but upholding immunity defense on the basis of reasonable suspicion of contraband); Walsh v. Franco, 849 F.2d 66, 69 (2d Cir.1988) (applying Weber to hold a search unconstitutional).
 
 
 104
 However, in Covino v. Patrissi, we applied the "legitimate penological interests" standard outlined in Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), to assess the constitutionality of a strip search of a pretrial detainee held in a prison with sentenced inmates. The prison in which Covino was detained had a policy of random visual body-cavity searches. Covino, 967 F.2d at 75. Observing that the Supreme Court applied Turner's "legitimate penological interests" test to all claims that prison regulations violate constitutional rights, see Washington v. Harper, 494 U.S. 210, 223-24, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), we analyzed the random search policy under the four factors of Turner:
 
 
 105
 (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.
 
 
 106
 Covino, 967 F.2d at 78-79 (citing Turner, 482 U.S. at 89-90, 107 S.Ct. 2254). Applying these factors, we concluded that the regulation was rationally related to legitimate security interests, there were no alternative means of exercising the detainee's right that would allow the prison to achieve the same level of effectiveness, the regulation accommodated the privacy rights of the detainee by conducting the search behind closed doors, and there was no "alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Id. at 79-80, 107 S.Ct. 2254 (internal quotation marks omitted).
 
 
 107
 In 2001, we attempted to reconcile these two lines of cases in Shain v. Ellison, supra. Judge Pooler's opinion for the majority observed that the Turner test governs the constitutionality of prison regulations. See Shain, 273 F.3d at 65. By limiting Covino to prison regulations, she reconciled Covino and the "reasonable suspicion" line of cases beginning with Weber, which all concerned events occurring in jails. See id. at 65-66. In concurrence, Judge Katzmann remarked that this Circuit's precedents required a distinction "either between misdemeanors and felonies or between jails and prisons," but observed that he did not find the distinction persuasive. See id. at 70. Judge Cabranes, in dissent, criticized the jail/prison distinction and argued that Weber's "reasonable suspicion" rule was not good law in light of Turner. Id. at 71-74; see also N.G. v. Connecticut, 382 F.3d 225, 234-35 (2d Cir.2004) (rejecting the Turner standard for strip searches in juvenile detention centers).
 
 
 108
 On this appeal, the parties assume, as did Judge Gleeson, see Dist. Ct. op. at *26, that the proper inquiry is whether the Plaintiff was housed at a jail or a prison. Finding that the MDC was most like a prison, Judge Gleeson applied the Covino/Turner standard. See id. This was correct. The Plaintiff was confined for an extended period of time in a prison-like environment, and it appears that he was charged with felonies, see 18 U.S.C. §§ 371, 1028. In the environment where the Plaintiff was held, the lesser reasonable suspicion standard would jeopardize prison officials' ability to maintain security.
 
 
 109
 As Judge Gleeson recognized, even if the precise standard governing intrusive searches of the Plaintiff at the MDC might not have been clearly established in 2001, it was clearly established that even the standard most favorable to prison officials required that strip and body-cavity searches be rationally related to legitimate government purposes. Cf. Hodges, 712 F.2d at 35 (holding that a plaintiff stated a Fourth Amendment claim where consecutive body-cavity searches were unnecessary). The complaint alleges that the Plaintiff was routinely strip searched twice after returning from the medical clinic or court and that, on one occasion, the Plaintiff was subjected to three serial strip and body-cavity searches in the same room. He also alleges that he was subjected to strip and body-cavity searches every morning. These allegations may reasonably be understood to claim that repeated strip and body-cavity searches were unrelated to legitimate government purposes and apparently were performed to punish. The Plaintiff has adequately alleged a violation of his clearly established Fourth Amendment rights. Of course, the success or failure of these claims will turn on the specific facts that are revealed after discovery or at trial.
 
 
 110
 Although exigent circumstances can justify some conduct that would otherwise violate Fourth Amendment standards, see, e.g., Tyler, 436 U.S. at 509, 98 S.Ct. 1942 (exigent circumstances justify warrantless entry into a home), the post-9/11 context does not provide a basis for conducting repeated and needless strip and body-cavity searches of a pretrial detainee. See Part I(f), above.
 
 VII. Interference with Religious Practices
 
 111
 Hasty also argues that Judge Gleeson should have dismissed the Plaintiff's First Amendment claim against him on qualified immunity grounds because (1) BOP regulations "conclusively establish" a lack of personal involvement and (2) the Plaintiff did not allege a violation of his First Amendment rights.
 
 
 112
 Both arguments lack merit. Hasty contends that the only "policy" on religion at the MDC was the official BOP policy, codified at 28 C.F.R. part 548, and that the Plaintiff has not indicated that these policies were suspended or that he availed himself of available complaint procedures, see 28 C.F.R. part 542. Hasty contends that he "was under no clearly established constitutional obligation to take affirmative steps to inquire whether Plaintiff observed particular religious practices, but as the BOP regulations instruct, Plaintiff had the responsibility to make his religious preferences known." Br. for Hasty at 47. But neither the complaint procedures nor the official policy governing religion allowed Hasty to ignore violations of detainees' First Amendment rights. If Hasty is arguing that the Plaintiff has forfeited his right to recover damages because he did not follow administrative complaint procedures, this may be relevant to the merits of the case, but it is not relevant to a qualified immunity defense.
 
 
 113
 Similarly without merit, Hasty argues that he could not be personally involved in any deprivations of religious freedom because BOP regulations establish that prison chaplains "are responsible for managing religious activities within the institution." 28 C.F.R. § 548.12. As the Plaintiff points out, however, Hasty ignores other regulations stating that the warden determines, among other things, what religious items may be used by prisoners, see id. § 548.16, and whether attendance at religious functions is open to all prisoners, id. § 548.15.
 
 
 114
 Hasty's second argument is that Plaintiff has not alleged a violation of his First Amendment rights. He relies on O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), which applied Turner's "legitimate penological interests" test to First Amendment claims, see id. at 348-49, 107 S.Ct. 2400. Though recognizing that a prison regulation precluded some Muslim prisoners from attending Friday prayers, see id. at 345, 107 S.Ct. 2400, the Supreme Court found the regulation justified under Turner, focusing on the officials' legitimate security objectives and the availability of other channels by which prisoners could exercise their religious rights, see id. at 350-53, 107 S.Ct. 2400. In the pending case, however, the Plaintiff alleges that he was not allowed to attend Friday prayers, that prison guards banged on his door when he tried to pray, and that his Koran was routinely confiscated.[11] These allegations suffice to preclude a qualified immunity defense at this stage of the litigation. In particular, consideration of Hasty's arguments—that "restrictions on movement and possessions ... were a necessary part of the legitimate and proper functioning of the maximum security procedures in the ADMAX SHU" and that such restrictions were "justified by security concerns and other institutional needs," Br. for Hasty at 49-50—must await factual discovery so that the Government's asserted security interests can be assessed against a factual record of what restrictions actually existed and what purpose they served.
 
 VIII. Racial and Religious Discrimination
 
 115
 The Defendants argue that they are entitled to qualified immunity on the Plaintiff's First Amendment claim of religious discrimination and Fifth Amendment claim of racial or ethnic discrimination on three grounds: (1) the Plaintiff has failed to state a violation of clearly established rights, (2) the Plaintiff's allegations of discriminatory intent are too conclusory, and (3) the Plaintiff has not alleged the personal involvement of Ashcroft and Mueller.[12]
 
 
 116
 The arguments of Ashcroft and Mueller challenging the sufficiency of the Plaintiff's race, ethnic, and religious discrimination claims misunderstand his complaint. They contend that his "complaint amounts to an objection that most of those persons determined to be of high interest to the 9/11 investigation were Muslim or from certain Arab countries," which they justify by pointing out that the 9/11 hijackers were Muslims from Arab countries. However, what the Plaintiff is alleging is that he was deemed to be "of high interest," and accordingly was kept in the ADMAX SHU under harsh conditions, solely because of his race, ethnicity, and religion. The Plaintiff also alleges that "Defendants specifically targeted [him] for mistreatment because of [his] race, religion, and national origin." These allegations are sufficient to state a claim of animus-based discrimination that any "reasonably competent officer" would understand to have been illegal under prior case law. See Malley, 475 U.S. at 341, 106 S.Ct. 1092; see also Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir.1999) (stating that racial classifications violate Equal Protection Clause where motivated by racial animus and having a discriminatory effect). Accordingly, the Plaintiff's racial, ethnic, and religious discrimination claims cannot be dismissed on qualified immunity grounds at this stage of the litigation.
 
 
 117
 Hasty also argues that the Plaintiff has failed to state a claim of discrimination. Citing Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("AAADC"), he argues that the Equal Protection Clause does not apply in the context of proceedings to remove illegal aliens and that the Government can permissibly deem nationals of a particular country to be a special threat. In AAADC, the Supreme Court concluded that a provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. § 1252(g), deprived the federal courts of jurisdiction to consider an illegal alien's selective enforcement challenge to deportation. See 525 U.S. at 487, 119 S.Ct. 936. The Court rejected the argument that it nevertheless had jurisdiction to consider an alien's constitutional arguments, holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," see id. at 488, 119 S.Ct. 936, even when the Government deports the alien "for the additional reason that it believes him to be a member of an organization that supports terrorist activity," id. at 492, 119 S.Ct. 936. AAADC affords the Defendants no relief. The Plaintiff is not challenging his deportation or even his arrest on criminal charges. Moreover, AAADC does not stand for the proposition that the Government may subject members of a particular race, ethnicity, or religion to more restrictive conditions of confinement than members of other races, ethnic backgrounds, or religions.
 
 
 118
 The Defendants argue that the Plaintiff's allegations of racial, ethnic, and religious animus are too conclusory. But, as discussed above, see Part I(e), Crawford-El indicates that courts cannot require a heightened pleading standard for civil rights complaints involving improper motive. In Phillip, 316 F.3d at 298-99, this Court held that Swierkiewicz's notice pleading standard applied to a civil rights complaint alleging racial animus. Although recognizing that the complaint did not "contain many evidentiary allegations relevant to intent," see id. at 299, we found the allegations sufficient to state a claim, observing that the complaint alleged that the plaintiffs were African-American, described the defendants' actions in detail, and alleged that the plaintiffs were selected for maltreatment "solely because of their color," id. at 298.
 
 
 119
 The Plaintiff's allegations suffice to state claims of racial, ethnic, and religious discrimination. He alleges in particular that the FBI Defendants classified him "of high interest" solely because of his race, ethnic background, and religion and not because of any evidence of involvement in terrorism. He offers additional factual support for this allegation, stating that "within the New York area, all Arab Muslim men arrested on criminal or immigration charges while the FBI was following an investigative lead into the September 11th attacks—however unrelated the arrestee was to the investigation—were immediately classified as `of interest' to the post-September 11th investigation." We need not consider at this stage of the litigation whether these allegations are alone sufficient to state a clearly established constitutional violation under the circumstances presented because they are sufficient to state a violation when combined with the Plaintiff's allegation that he was singled out for mistreatment and for unnecessarily punitive conditions of confinement based on his racial, ethnic, and religious characteristics.
 
 
 120
 Finally, Ashcroft and Mueller argue that the Plaintiff failed to allege their personal involvement in any discrimination. However, the complaint alleges broadly that Ashcroft and Mueller were instrumental in adopting the "policies and practices challenged here." The complaint also alleges that the FBI, "under the direction of Defendant Mueller," arrested thousands of Arab Muslims and that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject Plaintiff[] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." The Plaintiff acknowledges that the FBI Defendants made the determination that Plaintiff was "of high interest," but this allegation does not necessarily insulate Ashcroft and Mueller from personal responsibility for the actions of their subordinates under the standards of supervisory liability outlined above, see Part I(d). As with the procedural due process claim, the allegation that Ashcroft and Mueller condoned and agreed to the discrimination that the Plaintiff alleges satisfies the plausibility standard without an allegation of subsidiary facts because of the likelihood that these senior officials would have concerned themselves with the formulation and implementation of policies dealing with the confinement of those arrested on federal charges in the New York City area and designated "of high interest" in the aftermath of 9/11. Whether or not the issues of personal involvement will be clarified by court-supervised discovery sufficient to support summary judgment remains to be determined.
 
 IX. Section 1985(3) Conspiracy
 
 121
 The Defendants contend that they are entitled to qualified immunity on the Plaintiff's conspiracy claims under 42 U.S.C. § 1985(3) because (1) it was not clearly established that federal officials were subject to liability under section 1985(3), and (2) the Plaintiff's allegations of conspiracy are too conclusory to state a violation of clearly established law.
 
 
 122
 Clearly established law. A conspiracy claim under 42 U.S.C. § 1985(3) has four elements: (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. See United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). In addition, the conspiracy must be motivated by some class-based animus. See Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).
 
 
 123
 In Gregoire v. Biddle, 177 F.2d 579 (2d Cir.1949), this Court considered a section 1985(3) claim against several federal officials stemming from an allegedly false arrest. The Court first held that the officials had absolute immunity from the false arrest claim. See id. at 580-81. Turning to the section 1985(3) claim, the Court rejected the plaintiff's argument that "this language creates a claim against any two persons who conspire to injure another for spite or other improper motives, apparently because to single out anyone for illegal aggression is to deny him equal protection of the laws." Id. at 581. Gregoire has been interpreted by some lower courts to mean that section 1985(3) does not apply to federal officials. See, e.g., Lofland v. Meyers, 442 F.Supp. 955, 957 (S.D.N.Y. 1977); Williams v. Halperin, 360 F.Supp. 554, 556 (S.D.N.Y.1973); see also Hobson v. Wilson, 737 F.2d 1, 19 (D.C.Cir.1984) (criticizing Gregoire).
 
 
 124
 In Griffin, the Supreme Court held that section 1985(3) contains no requirement of state action and thus applies to private conspiracies. See 403 U.S. at 101, 91 S.Ct. 1790. Although this Court has had no occasion since Gregoire to consider whether section 1985(3) applies to conspiracies among federal officials, numerous courts of appeals, applying Griffin, have concluded that section 1985(3) applies to federal officials. See, e.g., Hobson, 737 F.2d at 20; Jafree v. Barber, 689 F.2d 640, 643 (7th Cir.1982); Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir.1980); Dry Creek Lodge, Inc. v. United States, 515 F.2d 926, 931 (10th Cir.1975).[13] We agree that the development of case law since Gregoire has eroded any basis for interpreting that decision to render section 1985(3) inapplicable to federal officials. And we also agree that, in the absence of prior Second Circuit case law on point, it was not clearly established in 2001 that section 1985(3) applied to federal officials. However, even without a definitive ruling from this Court on the application of section 1985(3) to federal officials, federal officials could not reasonably have believed that it was legally permissible for them to conspire with other federal officials to deprive a person of equal protection of the laws, at least where the officials' conduct, alleged to have accomplished the discriminatory object of the conspiracy, would violate the Equal Protection Clause. As we have recently held, "[T]he proper inquiry is whether the right itself—rather than its source—is clearly established." Russo v. City of Bridgeport, No. 05-4302-cv, 2007 U.S. App. LEXIS 4428, at *39 (2d Cir. June 12, 2007) (collecting cases), amending 479 F.3d 196 (2d Cir.2007).
 
 
 125
 Adequacy of allegations. Applying the normal pleading rules previously discussed, see Part I(e), even as supplemented by the plausibility standard, we have no doubt that the Plaintiff's allegations of a conspiracy to discriminate on the basis of ethnicity and religion suffice to withstand a motion to dismiss. Unlike the situation in Bell Atlantic, we do not encounter here a bare allegation of conspiracy supported only by an allegation of conduct that is readily explained as individual action plausibly taken in the actors' own economic interests.
 
 X. Personal Jurisdiction
 
 126
 The final issue is whether Judge Gleeson erred in denying the motions by Ashcroft, Mueller, and FBI Defendant Rolince to dismiss for lack of personal jurisdiction. Ordinarily, we would lack jurisdiction over this issue on this interlocutory appeal concerning qualified immunity. However, "[a] defendant who is entitled to immediate appellate review of a qualified immunity decision is also entitled to appellate review of pendant issues if those issues are inextricably intertwined with the question of qualified immunity or are otherwise necessary to ensure meaningful review of it." Toussie v. Powell, 323 F.3d 178, 184 (2d Cir.2003) (internal quotation marks omitted). "Whether issues are inextricably intertwined is determined by whether there is substantial factual overlap bearing on the issues raised." Id. (internal quotation marks omitted). Judge Gleeson recognized the overlap between the Defendants' personal jurisdiction arguments and personal involvement arguments pertaining to qualified immunity. See Dist. Ct. op. at *10.
 
 
 127
 Under New York's long-arm statute, a court may exercise jurisdiction over a non-domiciliary who "in person or through an agent ... commits a tortious act within the state" so long as the cause of action arises from that act. See N.Y. C.P.L.R. § 302(a)(2). As the District Court observed, see Dist. Ct. op. at *9-*10, personal jurisdiction cannot be predicated solely on a defendant's supervisory position. See Ontel Products, Inc. v. Project Strategies Corp., 899 F.Supp. 1144, 1148 (S.D.N.Y.1995). Rather, a plaintiff must show that a defendant "personally took part in the activities giving rise to the action at issue." Id.
 
 
 128
 The same intertwining of the issue of personal involvement with the issue of personal jurisdiction that provides us with pendent appellate jurisdiction also demonstrates that the pleading of personal involvement suffices to establish personal jurisdiction, at least at this preliminary stage of the litigation.
 
 Conclusion
 
 129
 For the foregoing reasons, the order of the District Court is affirmed as to the denial of the Defendants' motions to dismiss all of the Plaintiff's claims, except for the claim of a violation of the right to procedural due process, as to which we reverse. In affirming almost all of the District Court's ruling, we emphasize that we do so at an early stage of the litigation. We recognize, as did Judge Gleeson in ruling on the Plaintiff's procedural due process claim, see Dist. Ct. op. at *21, that carefully limited and tightly controlled discovery by the Plaintiff as to certain officials will be appropriate to probe such matters as the Defendants' personal involvement in several of the alleged deprivations of rights. We are mindful too that, for high-level officials, this discovery might be either postponed until discovery of front-line officials is complete or subject to District Court approval and additional limitations. We also recognize that the Defendants will be entitled to seek more specific statements as to some of the Plaintiff's claims and perhaps renew their claims for qualified immunity by motions for summary judgment on a more fully developed record.
 
 
 130
 In sum, the serious allegations of gross mistreatment set forth in the complaint suffice, except as noted in this opinion, to defeat the Defendants' attempt to terminate the lawsuit at a preliminary stage, but, consistent with the important policies that justify the defense of qualified immunity, the defense may be reasserted in advance of trial after the carefully controlled and limited discovery that the District Court expects to supervise.
 
 
 131
 Affirmed in part, reversed in part, and remanded.
 
 
 
 Notes:
 
 
 [1]
 The complaint does not identify the charges on which Iqbal was arrested, but Judge Gleeson's opinion states that he was charged with conspiracy to defraud the United States and fraud with identificationDist. Ct. op. at *1 n. 1.
 
 
 [2]
 Iqbal is a Muslim and a Pakistani, but not an Arab. Nevertheless, his claim is fairly to be understood as alleging unlawful treatment based on his ethnicity, even if not technically on a racial classification. And his allegations of what was done to Arab Muslims are fairly understood to mean that unlawful actions were taken against him because officials believed, perhaps because of his appearance and his ethnicity, that he was an Arab
 
 
 [3]
 The claims, in the order set forth in the complaint, are:
 
 
 [1]
 Fifth Amendment substantive due process claim based on the conditions of confinement: Hasty and MDC staff
 
 
 [2]
 Fifth Amendment procedural due process claim based on confinement in the ADMAX SHU: Ashcroft and Mueller, FBI Defendants, BOP Defendants, Hasty, and MDC staff
 3-4. Fifth and Eighth Amendments excessive force claims: Hasty and MDC staff.
 
 
 [5]
 Sixth Amendment interference with right to counsel claim: Hasty and MDC staff
 6-7. Fifth and Eighth Amendments denial of medical treatment claims: MDC staff (not at issue on this appeal).
 
 
 [8]
 Eighth Amendment conditions of confinement claim: Hasty and MDC staff
 
 
 [9]
 Fourth Amendment unreasonable search claim based on strip and body-cavity searches: BOP Defendant Sawyer (but not other BOP Defendants), Hasty, and MDC staff
 
 
 [10]
 First Amendment claim based on interference with religious practice: Hasty and MDC staff
 
 
 [11]
 First Amendment claim based on religious discrimination: Ashcroft and Mueller, FBI Defendants, BOP Defendants, Hasty, and MDC staff
 
 
 [12]
 Fifth Amendment race-based equal protection claim: Ashcroft and Mueller, FBI Defendants, BOP Defendants, Hasty, and MDC staff
 
 
 [13]
 Religious Freedom Restoration Act ("RFRA") claim based on conditions of confinement: Ashcroft and Mueller, FBI Defendants, BOP Defendants, Hasty, and MDC staff
 14-15. RFRA claims based on interference with religious practice and excessive force: Hasty and MDC staff.
 16-17. 42 U.S.C. § 1985(3) claims for conspiracy to deprive the Plaintiff of equal protection on the grounds of religion, race, and national origin: Ashcroft and Mueller, BOP Defendants, Hasty, and MDC staff.
 18-20. Federal Tort Claims Act ("FTCA") claims for assault and battery, negligent denial of medical treatment, intentional infliction of emotional distress: United States.
 
 
 [21]
 Alien Tort Claims Act ("ATCA") claim: Ashcroft and Mueller, FBI Defendants, BOP Defendants, Hasty, and MDC staff
 
 
 [4]
 Zenk, the MDC Warden at the time the lawsuit was filed, and the MDC medical assistant are not appealing Judge Gleeson's ruling
 
 
 [5]
 There is no possibility that the "weed out" language ofLeatherman was overlooked; it was called to the Court's attention in Justice Stevens's dissent. See Bell Atlantic, 127 S.Ct. at 1982.
 
 
 [6]
 The parties, not surprisingly, viewBell Atlantic entirely differently. Defendant Hasty characterizes the Supreme Court's decision as a "sea change" in the pleading standard of Rule 8, see Letter from Michael L. Martinez, counsel for Defendant Hasty, to the Acting Clerk of this Court (May 25, 2007); the Plaintiff emphasizes the antitrust holding of the decision, see Letter from Alexander A. Reinert, counsel for Plaintiff Iqbal, to the Acting Clerk of this Court (May 22, 2007).
 
 
 [7]
 For example, it would be cavalier to believe that the Court's rejection of the "no set of facts" language fromConley, which has been cited by federal courts at least 10,000 times in a wide variety of contexts (according to a Westlaw search), applies only to section 1 antitrust claims.
 
 
 [8]
 The Defendants do not seriously contest Judge Gleeson's characterization of the Plaintiff as a pretrial detainee, although Ashcroft and Mueller briefly contend that his private interest in avoiding detention in the ADMAX SHU after he pled guilty should be evaluated "within the context of the prison system,"i.e., under Eighth Amendment standards. The Plaintiff argues that he should be treated as a pretrial detainee until he was sentenced, citing Fuentes v. Wagner, 206 F.3d 335, 341 (3d Cir.2000).
 The circuits are divided as to whether to treat convicted, but unsentenced, inmates as pretrial detainees. Compare id. (treated as pretrial detainee) with Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir.2000) (treated as prisoner), Whitnack v. Douglas County, 16 F.3d 954, 956-57 (8th Cir.1994) (same), and Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir.1990) (same). Because none of the Defendants seriously challenges Judge Gleeson's characterization of the Plaintiff as a pretrial detainee throughout his entire confinement in the ADMAX SHU, we will refer to him as a pretrial detainee, a status that plainly applies during the several months of confinement prior to the Plaintiff's plea. We do not consider the question of whether convicted, but unsentenced, inmates are pretrial detainees under the Supreme Court's jurisprudence establishing criteria for evaluating constitutional limits on conditions of confinement.
 
 
 [9]
 SinceWolfish prohibited punishment prior to the process of adjudicating guilt, it could be considered a decision vindicating a procedural claim. However, as the Supreme Court's decisions in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and Sandin, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418, make clear, when the Court is truly considering a claim that restrictions were imposed within a prison without adequate procedures, it is focusing precisely on the procedural requirements of the Due Process Clause, and not what in reality is the substantive component that was at issue in Wolfish. See Block v. Rutherford, 468 U.S. 576, 591 & n. 12, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (applying Wolfish to pretrial detainees' substantive due process claim and distinguishing it from a procedural due process claim).
 
 
 [10]
 There is some question as to whether Hasty sought to dismiss the substantive due process claim or the excessive force claim,see Part IV, infra, in the District Court on the ground of qualified immunity, as distinguished from the merits of the claim. However, the District Court understood all the Defendants to "seek dismissal of all claims against them on qualified immunity grounds," Dist. Ct. op. at *10, and we are satisfied that we have jurisdiction of an appeal from the rulings that are premised on that understanding.
 
 
 [11]
 Hasty's arguments that the repeated banging on Iqbal's cell while he prayed shows that he was at least allowed to pray, and that the repeated confiscation of his Koran shows that he was at least permitted to have a Koran need no response
 
 
 [12]
 Judge Gleeson dismissed the discrimination claims against the BOP DefendantsSee Dist. Ct. op. at *29.
 
 
 [13]
 BOP Defendant Cooksey cites post-Griffin cases from the Fifth and Third Circuits stating that section 1985(3) does not apply to federal officials. See, e.g., Mack v. Alexander, 575 F.2d 488, 489 (5th Cir.1978); Bethea v. Reid, 445 F.2d 1163, 1164 (3d Cir.1971). However, these cases cite pre-Griffin cases for this proposition and neglect to consider Griffin.
 
 
 
 132
 JOSÉ A. CABRANES, Circuit Judge, concurring:
 
 
 133
 I concur fully in Judge Newman's characteristically careful and comprehensive opinion, which seeks to hew closely to the relevant Supreme Court and Second Circuit precedents, including the Supreme Court's decision in Bell Atlantic v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That said, it is worth underscoring that some of those precedents are less than crystal clear and fully deserve reconsideration by the Supreme Court at the earliest opportunity; to say the least, "the guidance they provide is not readily harmonized," Maj. Op. at 153.
 
 
 134
 Most importantly, the opinion's discussion of the relevant pleading standards reflects the uneasy compromise—forged partially in dicta by the Supreme Court in Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)—between a qualified immunity privilege rooted in the need to preserve "the effectiveness of government as contemplated by our constitutional structure," Harlow v. Fitzgerald, 457 U.S. 800, 820 n. 35, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.
 
 
 135
 Here, that uneasy compromise presents itself in a case brought by Javaid Iqbal, a federally convicted felon now residing in his native Pakistan. Iqbal does not challenge his arrest in the aftermath of 9/11, his detention, his conviction, or his apparent subsequent deportation. Iqbal instead challenges his separation from the general prison population at the Metropolitan Detention Center and his treatment during that separation. He claims that his separation stemmed from a general policy authorized at the highest levels of government in the wake of 9/11. But most, if not all, of the assertedly unlawful actions in his complaint—including the decision to place plaintiff in the ADMAX SHU and the abuses which purportedly ensued there—are alleged to have been carried out by defendants much lower in the chain of command.
 
 
 136
 Nevertheless, as a result of the Supreme Court's precedents interpreting Rule 8(a), even as modified by the "plausibility standard" established in Bell Atlantic, 127 S.Ct. at 1968, it is possible that the incumbent Director of the Federal Bureau of Investigation and a former Attorney General of the United States will have to submit to discovery, and possibly to a jury trial, regarding Iqbal's claims. If so, these officials—FBI Director Robert Mueller and former Attorney General John Ashcroft—may be required to comply with inherently onerous discovery requests probing, inter alia, their possible knowledge of actions taken by subordinates at the Federal Bureau of Investigation and the Federal Bureau of Prisons at a time when Ashcroft and Mueller were trying to cope with a national and international security emergency unprecedented in the history of the American Republic. In Bell Atlantic, the Supreme Court has quite rightly expressed concern that "careful case management" might not be able to "weed[] out early in the discovery process" an unmeritorious claim in private civil antitrust litigation, see Bell Atlantic, 127 S.Ct. at 1967, and might have limited success in "checking discovery abuse," id. This concern is all the more significant in the context of a lawsuit against, inter alia, federal government officials charged with responsibility for national security and entitled by law to assert claims of qualified immunity. Even with the discovery safeguards carefully laid out in Judge Newman's opinion, it seems that little would prevent other plaintiffs claiming to be aggrieved by national security programs and policies of the federal government from following the blueprint laid out by this lawsuit to require officials charged with protecting our nation from future attacks to submit to prolonged and vexatious discovery processes.
 
 
 137
 The decision in this case may be required by the faithful application of the relevant precedents by a court of inferior jurisdiction. But a detached observer may wonder whether the balance struck here between the need to deter unlawful conduct and the dangers of exposing public officials to burdensome litigation—a balance compelled by the precedents that bind us—jeopardizes the important policy interest Justice Stevens aptly described as "a national interest in enabling Cabinet officers with responsibilities in [the national security] area to perform their sensitive duties with decisiveness and without potentially ruinous hesitation." Mitchell v. Forsyth, 472 U.S. 511, 541, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (Stevens, J., concurring in the judgment).[1]
 
 
 
 Notes:
 
 
 [1]
 The Supreme Court's recognition inBell Atlantic that "proceeding to ... discovery can be expensive," Bell Atlantic, 127 S.Ct. at 1967 has particular resonance where, as here, discovery would not only result in significant cost but would also deplete the time and effectiveness of current officials and the personal resources of former officials. Indeed, as Justice Stevens noted, "[p]ersons of wisdom and honor will hesitate to answer the President's call to serve in these vital positions if they fear that vexatious and [in some cases] politically motivated litigation associated with their public decisions will squander their time and reputation, and sap their personal financial resources when they leave office." Mitchell, 472 U.S. at 542, 105 S.Ct. 2806 (Stevens, J. concurring in the judgment); see also Harlow, 457 U.S. at 814, 102 S.Ct. 2727 (noting the "danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties" (alteration in original) (internal quotation marks omitted)).